1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Eric Hodgson,                              No. 2:20-cv-00650-KJM-DB

12                   Plaintiff,                  ORDER

13        v.

14   Randle Roper, et al.,

15                   Defendants.

16

17        Eric Hodgson was once the director of sales at Vacaya LLC, an event planning company.

18   He claims in this action that Vacaya's founders lied to him about the company's finances and

19   falsely promised to reward his services with a valuable equity stake.  This court dismissed

20   Hodgson's previous complaint because it lacked the particularized factual allegations required by

21   Federal Rule of Civil Procedure 9(b).  Hodgson's renewed allegations again fall short of the

22   mark, as explained below.  His federal claims are dismissed, and the court declines to exercise

23   supplemental jurisdiction over his state law claims.  Hodgson's complaint is thus **dismissed**

24   **without leave to amend**, as explained in the first section below.

25        Defendants also move for sanctions.  Hodgson previously was convicted of fraud in

26   California state court.  While the defendants were preparing their current motion to dismiss, they

27   discovered Hodgson had lied to them about his conviction while the company was considering

28   whether to engage him as a contractor.  His deception included the forgery of two state court

                                      1

1  orders, which he had forwarded to the defendants in an effort to minimize or downplay the

2  conviction.  The defendants began pursuing a fraudulent inducement defense.  Hodgson and his

3  attorney, Thomas Barth, responded to that defense with a variety of contradictory and speculative

4  claims, including the illogical accusation that one of the defendants was actually the mastermind

5  of Hodgson's forgery.  Most of these claims lack any evidentiary support aside from two

6  declarations by Hodgson, which are themselves self-contradicting, inconsistent with the

7  complaint and speculative.  Defendants' motion is well-founded and the court agrees Hodgson's

8  and Barth's conduct warrants the imposition of sanctions under Federal Rule of Civil Procedure

9  11, 28 U.S.C. § 1927 and this court's inherent authority to prevent abuse.  The defendants'

10  motion for sanctions is thus **granted**, as explained in the second section below.

11  **I.      MOTION TO DISMISS**

12        **A.      Hodgson's Allegations**

13        At this stage, the court assumes the allegations in Hodgson's second amended complaint

14  are true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  He alleges as follows.

15        In 2015, Hodgson was serving a prison sentence after pleading guilty to defrauding the

16  California Department of Transportation.  *See* Hodgson Decl. ¶ 2, ECF No. 24-3; Second Am.

17  Compl. ¶¶ 12–13, ECF No. 22; *see also* Gard Decl., *People v. Hodgson*, No. 13F02606 (Cal.

18  Super. Ct. Sacramento Cty. filed Apr. 24, 2013).[1]  He began exchanging letters with Randle

19  Roper, an old friend, about Roper's plan to start a new event planning company.  At the time,

20  Roper was affiliated with Atlantis Ventures, a company that marketed cruises and resort

21  vacations.  Second Am. Compl. ¶ 12.  These conversations continued after Hodgson was released.

22  *Id.* ¶ 20.  Roper encouraged Hodgson to help him build the new company, and he offered to give

23  /////

---

[1] The court takes judicial notice of the statements in this document as undisputed matters of public record, but only to the extent they illustrate the allegations and evidence against Hodgson in the criminal case.  The court does not assume the claims within the declaration are in fact true.  *See* Fed. R. Civ. P. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006) (taking judicial notice of "state court orders and proceedings").  A copy of this declaration is docketed at ECF No. 29-3 in this action.

Hodgson equity in the new company in exchange for his support. *Id.* Roper also gave Hodgson a packet with projections of the new company's earnings. *See id.* ¶¶ 17, 22.

The startup was eventually organized as Vacaya LLC in the Fall of 2017. *See id.* Ex. A at 1, ECF No. 22-1. Vacaya originally had three members: Roper, John Finen and Patrick Gunn. *See id.* Ex. A, Sched. A. A fourth investor, Tracy Terrill, joined Vacaya a little more than a year later. *Id.* ¶ 19. Hodgson did not immediately join the company as a member, but Vacaya did engage him as a consultant for a monthly fee. *Id.* ¶¶ 29–30. Unfortunately, Vacaya could not afford Hodgson's fee after the first month. *See id.* ¶ 30. The company needed his continued support, however, so Roper, Terrill and Finen offered to compensate him by eventually voting to make him a member of the company and by awarding him an equity interest equal to the value of his unpaid fees, among other contributions. *Id.* ¶ 32. Finen and Terrill repeated these promises over the next year. *See, e.g., id.* ¶¶ 33, 36–37. They regularly sent Hodgson a spreadsheet tracking the growing value of his contributions and potential equity interest. *See, e.g., id.* ¶¶ 33, 40. Hodgson stayed on. *Id.* ¶ 38. He worked as director of sales and traveled extensively at his own cost, and he donated the services of his printing company, believing his efforts would be rewarded with a valuable equity stake. *Id.* ¶¶ 36, 38–39.

Finen and Terrill also spoke to Hodgson about a plan to wrest control over the new company from Roper and Gunn. Finen and Terrill had become disillusioned with Roper's experience and influence, and they thought Roper had become a "tyrant." *See id.* ¶¶ 33, 36, 37. They told Hodgson that if he became a member, joined the board, and received a large enough share of the company's equity, Hodgson could combine his votes with Finen's and Terrill's and force changes to the operating agreement over opposition from Roper and Gunn. *See id.*

Hodgson claims Finen and Terrill never intended to fulfill these promises. *See, e.g., id.* ¶¶ 33–34. Instead, he claims, Finen and Terrill were planning to grant him ownership of only a small part of the company's equity, and they intended for that stake to vest gradually over a period of four years, not immediately. *Id.* ¶ 34. These allegedly false promises were meant only to string Hodgson along—to persuade him to contribute more and more of his time and services to the cash-strapped, fledgling business. *Id.*

1       In August 2018, the company's finances took a hit when Roper, Gunn and Vacaya were

2   named as defendants in a lawsuit in California state court.  *Id.* ¶ 41.  Roper's and Gunn's former

3   employer, Atlantis Events, alleged the two men had stolen proprietary information and trade

4   secrets and were using that information at Vacaya.  *See id.*  Roper denied these allegations.  *Id.*

5   ¶ 43.  He hired outside counsel to represent himself, Gunn and Vacaya in the lawsuit and used the

6   company's funds to pay their legal expenses.  *See id.* ¶ 42.

7       Early the next year, while the lawsuit was pending, Roper, Gunn, Finen and Terrill sent

8   Hodgson a proposal to make him a member of the company and to give him an equity stake.  *Id.*

9   ¶ 50.  The proposal did not live up to Hodgson's expectations.  *See id.*  It did not grant him equal

10  ownership, for example, and his equity would not vest immediately.  *See id*.  The agreement also

11  imposed a supermajority voting requirement that gave Roper and Gunn effective veto power over

12  any changes to the company's operating agreement until January 2020.  *See id.*  Finen urged

13  Hodgson to take the deal, lackluster though it was.  *See id.*  He told Hodgson that Roper and

14  Gunn would never approve an arrangement that gave Hodgson an equity stake as large as Finen

15  had promised, and Finen urged Hodgson to be patient.  *Id.*  "For now," Finen told Hodgson, "we

16  have to get you on the board in a way that won't raise alarm."  *Id.*  Finen and Terrill promised to

17  make Hodgson an equal member when the supermajority voting provisions expired.  *See id.* ¶ 52.

18      Hodgson agreed to become a member.  *Id.* ¶ 53.  But before January arrived, his

19  relationship with the company's other members soured.  In the summer of 2019, Terrill broke the

20  news that sagging sales would prevent the company from paying its members' salaries for the

21  next two years.  *Id.* ¶ 68.  Terrill also told Hodgson that the company's financial projections—the

22  same projections Roper and Finen had given Hodgson the year before—had understated the

23  company's true costs, and when Hodgson confronted Finen with Terrill's claims, Finen admitted

24  it.  *Id.* ¶ 58.  According to the complaint, Roper and Gunn also admitted they had retained and

25  were using Atlantis's proprietary information.  *Id.* ¶ 60.  Hodgson also came to believe that

26  Roper, Finen and Gunn had lied in depositions in the Atlantis lawsuit.  *See id.* ¶ 61.  Hodgson

27  began demanding that Roper and Gunn indemnify him for the company's litigation expenses and

28  any damages.  *See id.* ¶ 62.

The conflict boiled over during a mediation in October 2019, when Hodgson told the other members and the company's lawyers he believed their legal defense was "based on a series of lies." *Id.* ¶ 69. He "repeatedly demanded" that Roper and Gunn "take full financial responsibility for the entire cost of the Atlantis lawsuit." *Id.* Despite having said before that they would join in these demands, Terrill and Finen were silent. *See id.* ¶¶ 63, 69. Hodgson believes the lawsuit settled after the mediation and suspects it included a large cash payment. *See id.* ¶ 69. Hodgson confronted Finen and Terrill after the mediation. *Id.* ¶ 71. He demanded they honor their promise to support his indemnification request, but Finen and Terrill said that they were "stepping away from any continued involvement in Vacaya." *Id.*

Hodgson began looking for other work the next month. *Id.* ¶ 72. He found a consulting job with another organization and arranged to join a tour in South Africa. *Id.* A colleague from Vacaya joined him as a guest "to assist with social media concerning the trip," but after "multiple disruptions," Hodgson sent the colleague home early. *Id.* ¶¶ 73, 79. The next month, Roper, Gunn, Finen and Terrill suspended Hodgson's membership in Vacaya. *See id.* ¶ 74. They told him the company was investigating whether he had misused its resources during his trip and whether he had harassed his colleague. *See id.* ¶ 74. Hodgson denies misusing resources or harassing anyone, *id.* ¶ 78, but after the investigation was complete, Roper, Gunn, Finen and Terrill voted unanimously to terminate Hodgson's membership in the company for cause, *id.* ¶ 82. They originally agreed to repurchase his vested membership units, but they have not done so. *Id.* ¶¶ 82–83.

Hodgson sued Roper, Gunn, Finen, Terrill and Vacaya in this court a few days after he was removed from the company. *See generally* Compl., ECF No. 1. He asserted fraud and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act and made several related fraud claims under California law. *See generally id.* The defendants moved to dismiss or to transfer the case to the District of Delaware; Vacaya is a Delaware company. ECF No. 8. Hodgson amended his complaint in response, ECF No. 14, and the defendants renewed their motion, ECF No. 15. The court granted the defendants' renewed motion to dismiss in part with leave to amend and denied the motion to transfer. Prev. Order (Aug. 26, 2020), ECF No. 21.

1   Hodgson then filed his operative second amended complaint.  ECF No. 22.  The defendants now

2   move again to dismiss or, in the alternative, for summary judgment.  *See* Mot. Dismiss, ECF No.

3   23; Mem. Dismiss, ECF No. 23-1.  Hodgson opposes.  *See* Opp'n Dismiss, ECF No. 24.  Briefing

4   is complete, and the court submitted the motion without a hearing.  *See* Reply Dismiss, ECF No.

5   26; Min. Order, ECF No. 35.

6        **B.**       **Motions to Dismiss RICO Claims**

7        A party may move to dismiss for "failure to state a claim upon which relief can be

8   granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint lacks a

9   "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

10   *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v.*

11   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual

12   allegations are true and construes "them in the light most favorable to the nonmoving party."

13   *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch.*

14   *of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do

15   not "plausibly give rise to an entitlement to relief," the motion must be granted.  *Iqbal*, 556 U.S.

16   at 679.

17        The court begins with Hodgson's federal claims, which both arise under the Racketeer

18   Influenced and Corrupt Organizations (RICO) Act.  *See* Second Am. Compl. ¶¶ 88–99.  That act

19   "provides for both criminal and civil liability."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 545 (9th

20   Cir. 2007) (en banc).  Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or

21   associated with any enterprise engaged in . . . interstate or foreign commerce to conduct or

22   participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

23   racketeering activity."  Under § 1962(d), it is also unlawful to conspire to violate § 1962(c).  *See*

24   18 U.S.C. § 1962(d).  Hodgson asserts claims under both provisions.  *See* Second Am. Compl.

25   ¶¶ 88–99.  Hodgson's conspiracy claim is derivative of his direct claim under § 1962(c), so his

26   direct claim under that subsection is the natural place to start.

27        "To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise

28   (3) through a pattern (4) of racketeering activity.'"  *Odom*, 486 F.3d at 547 (quoting *Sedima,*

1    *S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  The defendants argue the complaint falls short

2    of the third and fourth elements: a "pattern" of "racketeering activity."  *See* Mem. Dismiss at 13–

3    16.  The statute defines "racketeering activity" by identifying two categories: first, the activity

4    includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery,

5    extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . ,

6    which is chargeable under State law and punishable by imprisonment for more than one year."

7    18 U.S.C. § 1961(1)(A).  Second, the statute lists several acts indictable under specific sections of

8    Title 18 of the U.S. Code, such as mail and wire fraud.  *See id.* § 1961(1)(B) (citing 18 U.S.C.

9    §§1341 & 1343).  A "pattern" of racketeering activity occurs when at least two acts of

10   racketeering activity, i.e., "predicate acts," occur within the same ten-year period.  *See* 18 U.S.C.

11   § 1961(5).

12        Despite this expansive definition, the Supreme Court has determined that Congress did not

13   intend to automatically bundle every pair of "widely separated and isolated criminal offenses"

14   into a "pattern of racketeering activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)

15   (citation omitted).  To prevail on a racketeering claim, a plaintiff must also ultimately prove the

16   predicate acts are "related" and "amount to or pose a threat of continued criminal activity."  *Id.*

17   Predicate acts are "related" if they "have the same or similar purposes, results, participants,

18   victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics

19   and are not isolated events."  *Id.* at 240 (quoting 18 U.S.C. § 3575(e)).  Predicate acts pose a

20   threat of continued criminal conduct if either (1) "a series of related predicates" extended "over a

21   substantial period of time"—in practice a year or more—or (2) "past conduct," by its nature,

22   "projects into the future with a threat of repetition."  *Religious Tech. Ctr. v. Wollersheim*,

23   971 F.2d 364, 366–67 (9th Cir. 1992) (quoting *H.J., Inc.*, 492 U.S. at 240–41).  Hodgson pursues

24   relief under only one of these theories: he alleges the defendants' actions extended over a

25   substantial period of time.  *See* Opp'n at 16–17.  As a result, he can state a claim only if the

26   allegations of his complaint permit a plausible inference that the defendants engaged in a series of

27   predicate acts over a period of at least a year.

28   /////

1    Hodgson relies on three categories of predicate acts: thefts of trade secrets, mail fraud and

2    wire fraud.  *See* Second Am. Compl. ¶ 92 (citing 18 U.S.C. §§ 1341, 1343, 1832 and 1961(1)(B)).

3    The allegations in the first two of these categories—thefts of trade secrets and mail fraud—may

4    be dismissed without extensive discussion.  First, Hodgson's allegations of stolen trade secrets are

5    unrelated to his fraud allegations, as the court previously held, *see* Prev. Order at 12–13, so those

6    allegations do not permit any inference of the defendants' racketeering liability.  Second,

7    Hodgson does not allege the defendants used the mail to further their alleged scheme, so his mail

8    fraud claims also fall short of the mark.  As a result, only Hodgson's wire fraud allegations could

9    support his racketeering claims.  The court thus turns to those allegations, beginning with the

10   standards for pleading wire fraud.

11        **C.      Pleading Wire Fraud**

12        A wire fraud claim has three elements: "(1) the formation of a scheme or artifice to

13   defraud; (2) use of the United States wires or causing a use of the United States wires in

14   furtherance of the scheme; and (3) specific intent to deceive or defraud."  *Odom*, 486 F.3d at 554

15   (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986)).

16   Under Rule 9(b), wire fraud must be pleaded with particularity.  *See id.*  Rule 9(b) does not,

17   however, demand specific allegations about a defendant's secret thoughts and desires.  "The only

18   aspects of wire fraud that require particularized allegations are the factual circumstances of the

19   fraud itself."  *Id.*  These circumstances include, first of all, "the time, place, and specific content

20   of the false representations as well as the identities of the parties to the misrepresentation."  *Id.* at

21   553 (quoting *Schreiber*, 806 F.2d at 1401).  But there is more to fraud than the "the who, what,

22   when, where, and how."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

23   (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  A complaint must also include

24   allegations about what circumstances show a statement was false or misleading at the time.  *See*

25   *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded in part*

26   *on other grounds as recognized in Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001).

27        Hodgson's wire fraud claims fall short of this second requirement, so a more careful

28   explanation of that requirement is worthwhile.  In *GlenFed Securities*, the en banc Ninth Circuit

8

1  described a spectrum of fraud claims.  *See* 42 F.3d at 1548–49.  On one end of the spectrum are

2  cases in which "falseness is clear from the facts that had existed all along."  *Id.* at 1549.  "[A]

3  plaintiff might allege that he bought a house from defendant, that defendant assured him that it

4  was in perfect shape, and that in fact the house turned out to be built on landfill, or in a highly

5  irradiated area."  *Id.* at 1548.  To comply with Rule 9(b) in such a simple case, a plaintiff could

6  simply allege those facts along with a time and a place.  *See id.*  "The house was *always* defective

7  because it was *always* built on a landfill."  *Id.* (emphasis in original).  A contradiction itself can

8  thus satisfy Rule 9(b) in a simple case.

9       Most frauds are not so simple.  In *GlenFed Securities*, the Ninth Circuit cited securities

10 fraud as an example from the opposite side of the spectrum, where cases are complex and more

11 facts are required.  *See id.* at 1548–49.  In many securities fraud cases, there is no reason to

12 assume that what was true at one moment was also true at another.  *Id.* at 1548.  Markets might

13 decline, consumer demand might shift, or a new competitor might emerge.  *See id.*  "When such

14 an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering

15 revelations make the earlier, cheerier statement a falsehood."  *Id.*  A plaintiff must also offer "an

16 explanation as to why the disputed statement was untrue or misleading when made."  *Id.* at 1548–

17 49 (emphasis omitted).  For example, a plaintiff might allege the defendants later admitted they

18 "knew it all along" or had internal reports that contradicted a particular claim.  *Id.* at 1549 & n.9.

19      For cases falling between these extremes, detailed particulars might be necessary, and

20 they might not.  Sometimes a simple contradiction between one statement and another is enough

21 to show the first statement was false at the time.  *See id.* at 1549.  But if the contradiction might

22 have been the result of an innocently mistaken estimation, or if the contradiction could be

23 attributable to an unanticipated "external event," then a plaintiff cannot satisfy Rule 9(b) by citing

24 that contradiction and nothing more.  *See id.*  A complaint would also need to "elaborate" the

25 circumstances of the allegedly false statement.  *Id.*

26      **D.    Hodgson's Wire Fraud Allegations**

27      This case is an example falling between the two extremes the Ninth Circuit described in

28 *GlenFed Securities*.  Hodgson identifies two frauds in his complaint: exaggerations of Vacaya's

potential profits and false promises of fully vested equity ownership equal to the value of his

contributions.  A bare contradiction alone is insufficient to support either of these claims.  For the

first claim, financial projections are estimates, so Hodgson must explain what circumstances

show those estimates were not just bad guesses, but rather misleading statements of fact.  For the

second claim, good-faith promises might have become impossible to fulfill for reasons beyond

the defendants' foresight or control, so Hodgson must explain what circumstances show the

defendants never intended to do as they said.  Most of Hodgson's allegations are about the

defendants' alleged false promises, not the misleading projections, so the court begins with those

promises.

    The court first strips away any allegations for which Hodgson does not allege who said

what, when, where, to whom and how.  *See Vess*, 317 F.3d at 1105.  Many of Hodgson's claims

do not pass this filter.  He alleges, for example, that the defendants made promises by unspecified

"electronic means in approximately June 2018," Second Am. Compl. ¶ 32, and used various

unspecified "emails, texts, telephone calls, and other electronic media" to make promises between

"about May 2018" and "approximately February 2019," *id.* ¶ 36.  Such broad allegations do not

"provide the particulars of when, where, or how" the alleged fraud occurred.  *Vess*, 317 F.3d

at 1106.

    Hodgson does make a few particular allegations of false promises, but he has not offered

facts to show these promises were false when the defendants made them.  To explain why that is

so, the court first reviews the details of those promises.

    The first promise arrived in Hodgson's email inbox on June 18, 2018.  *See* Second Am.

Compl. ¶ 33.  Finen promised to "get [Hodgson] on the board as an equal partner" and to apply

the amount of his invoices for printing services to Hodgson's "buy in."  *Id.*  Finen similarly

promised to add everything Hodgson could "throw at this" to the value of his equity stake.  *Id.*

    Next, approximately six months later, on December 30, 2018, Finen emailed Hodgson

again and promised Hodgson's shares would soon be fully vested and he would be "up to speed"

with the company's other members.  *Id.* ¶ 45.  Finen reassured Hodgson that Gunn would be "so

diluted at that point that he won't be an issue," and they could then "dismiss him from the board

1    entirely." *Id.*  In another email sent the same day, Finen told Hodgson he had "shared the details

2    of the plan" with Terrill, and was "just waiting on [Terrill] to affirm the two motions which is just

3    a question of when he gets on the ground long enough to catch up on his emails." *Id.*  These

4    "motions" were the procedural steps the company had to undertake to ensure Hodgson and

5    another investor would "become vested owners of Vacaya." *Id.*

6        Early the next year, on February 25, 2019, Finen sent an email to Hodgson attaching what

7    he described as a "draft" of Hodgson's "partnership papers." *Id.* ¶ 50.  Finen acknowledged the

8    papers were not exactly what Hodgson had hoped for, but he told Hodgson they could "amend

9    everything [they] talked about" after voting Hodgson "onto the board." *Id.*  "It's going to be a

10   step by step process," Finen explained, "since there's no way [Roper] or [Gunn] will vote you in

11   if they know you will end up with more shares than one or eventually both of them." *Id.*  The

12   first step was moving Hodgson "onto the board in a way that won't raise alarm." *Id.*  Later that

13   day, Finen emailed a table showing how Hodgson's additional investments would dilute Gunn's

14   shares and could force Gunn out of the company by the following January.  *See id.* ¶ 51.

15       A few months later, in May 2019, Vacaya's founders voted to make Hodgson a member

16   of the company.  *Id.* ¶ 53.  As Finen had warned, however, Hodgson did not immediately become

17   a fully vested member.  Roper was indeed wary.  He refused to vote for Hodgson's membership

18   unless the company first adopted a supermajority voting provision that effectively froze the terms

19   of the company's operating agreement until the end of the year.  *Id.*  This stymied Finen's and

20   Hodgson's plan to amend the agreement much sooner.  *See, e.g.*, *id.* ¶ 50.  Roper also demanded

21   that Hodgson's equity stake be limited to 10 percent, not the 25 percent he had earned, and Roper

22   demanded that the equity vest gradually over the next four years, not immediately.  *Id.* ¶ 53.

23       Finally, after Hodgson became a member, "[o]n or about June 15, 2019," Finen and Terrill

24   sent him a spreadsheet on Slack.[2]  *Id.* ¶ 56.  The spreadsheet showed that Hodgson's stake had

---

[2] Slack describes itself as "the leading channels-based messaging platform" and "a new layer of the business technology stack where people can work together more effectively, connect all their other software tools and services, and find the information they need to do their best work."  Slack Technologies, Inc., Form 10-K at 3 (Mar. 19, 2021); *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (affirming judicial notice of Securities and Exchange Commission filings).

grown to $285,000.  *Id.*  Finen and Terrill claimed this equity "would be fully vested soon after January 1, 2020" and would then be greater than the defendants' own equity.  *Id.*  But before the first of January arrived, Hodgson's relationship with the company's other members deteriorated, as summarized above.  Terrill told him the company could not afford to pay his salary for the next two years, *see id.* ¶ 68; Hodgson came to believe Roper, Finen and Gunn had perjured themselves, *see id.* ¶¶ 58, 60, 61, 62, 69; Hodgson began demanding indemnification for the costs of the Atlantis lawsuit, *see id.* ¶¶ 62, 69; he sought other work, *see id.* ¶ 72, and the company's members accused him of misusing its resources and harassment, *see id.* ¶¶ 73–74, 77; and the defendants eventually voted unanimously to terminate Hodgson's membership, *id.* ¶ 82.

These allegations do not support Hodgson's claims of wire fraud.  His first problem is the absence of any factual claim about promises by Roper and Gunn.  Only Finen and Terrill sent emails and Slack messages.  For that reason, Hodgson has not stated any racketeering claims against Roper and Gunn.

The second problem afflicts all of the allegations against Finen and Terrill.  Hodgson offers only generalities, not facts, when he alleges they never actually intended to fulfill their promises, and the facts he does include in his complaint do more harm to his case than good.  Specifically, his factual allegations undermine his claims by offering an "obvious alternative explanation" for Finen's and Terrill's behavior, which renders his generic assertion of fraud implausible.  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 682).

To begin, according to Hodgson, Finen and Terrill believed Vacaya needed Hodgson's support if the company were to remain viable.  *See* Second Am. Compl. ¶¶ 34, 46, 52, 57.  Vacaya could not afford to pay him in cash, he alleges, so equity was the obvious alternative.  *See id.*  Finen and Terrill knew, however, that Roper and Gunn would reject any plan that gave Hodgson too much control.  *See id.* ¶ 50.  They also thought Roper had become a "tyrant" and had "misled" them about his influence and expertise, *see id.* ¶ 36, and both Roper and Gunn had become defendants in litigation with their former employer, *id.* ¶ 41.  These are, again, all just allegations, so they may be untrue.  But if one assumes they are true, as the court must at this

1  stage, there is an obvious solution to the problem Hodgson sets up in his complaint: Finen and

2  Terrill could agree to vote Hodgson into the company membership, to amend the operating

3  agreement, to vest him with voting rights equal to the value of his contributions, and to overcome

4  inevitable resistance from Roper and Gunn.  And that is what Hodgson alleges they did.  *See, e.g.*,

5  *id.* ¶¶ 33, 45, 50, 51, 56.  Finen and Terrill even took the first step along this path by voting

6  Hodgson into the company's membership.  *See id.* ¶ 53.  But then, after the settlement with

7  Atlantis, they stepped away from the company, and the plan was never fulfilled.  *See id.* ¶ 71.

8       Given these circumstances, Hodgson cannot support his fraud claims by alleging he was

9  expelled from the company before promises were fulfilled.  He must explain, alleging particular

10  facts, why some "external event" was not to blame.  *GlenFed Securities*, 42 F.3d at 1549.  He

11  does not.  Again his factual allegations undermine his position rather than support it.  He alleges

12  he was expelled unanimously after (1) charging Roper, Gunn and Finen with fraud and perjury,

13  *id.* ¶¶ 58, 60–62, 69; (2) demanding indemnification for the company's litigation expenses, *id.*

14  ¶¶ 62, 69; (3) leaving to find other work, *id.* ¶¶ 72, 73; and (4) facing allegations of misusing

15  company resources and harassment, *id.* ¶¶ 74, 79.  In short, these allegations suggest Finen and

16  Terrill originally intended for Hodgson to become a member on the terms they allegedly

17  promised, but could not fulfill those promises because the alleged plan was no longer feasible.

18  Without factual allegations showing otherwise, the complaint does not satisfy the particularity

19  requirement of Rule 9(b) with respect to Hodgson's claims of false promises.

20       This theory of false promises is only one component of Hodgson's wire fraud theory.

21  Hodgson also alleges that Roper and Finen emailed him misleading financial projections in April

22  2018.  *See id.* ¶¶ 22–28.  But the court need not decide whether these allegations could also

23  support a wire fraud claim.  Even if they did, that one remaining fraud is only one fraud, and a

24  single fraud cannot by definition be a "pattern of racketeering activity," so it cannot support a

25  racketeering claim.  *See* 18 U.S.C. § 1961(5).  The court thus dismisses Hodgson's direct

26  racketeering claim under § 1962(c).

27       Hodgson's indirect claims of a racketeering conspiracy fall short for the same reasons.  If

28  a complaint does not permit a court to infer a violation of § 1962(c), then it cannot state a claim

1   for a conspiracy to violate that section under § 1962(d).  *See Howard v. Am. Online Inc.*, 208 F.3d

2   741, 751 (9th Cir. 2000).  The court therefore also dismisses claim two.

3          **E.       Amendment and Remaining Claims**

4          Ordinarily, when a complaint is dismissed for a failure to include factual allegations, it

5   should be dismissed with leave to amend.  *See, e.g.*, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4*

6   *Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) ("Normally, when a viable case may be pled, a

7   district court should freely grant leave to amend.").  This court has, however, already granted

8   Hodgson an opportunity to amend his complaint after finding insufficient factual allegations to

9   support his fraud claims.  *See* Prev. Order at 12–20.  Hodgson was not able to cure the

10  insufficiency through amendment.  He also has now made two amendments in attempting to

11  respond to motions to dismiss.  In these circumstances, the court declines to permit yet another

12  amendment.  *See Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir.

13  2013) (affirming dismissal without leave to amend because plaintiff had "already had three

14  chances to assert its claims").  Hodgson's federal claims are thus dismissed without leave to

15  amend.

16         Hodgson's remaining claims all arise under state law.  *See* Second Am. Compl. ¶¶ 1,

17  100–37.  Because the parties are not completely diverse, *see id.* ¶¶ 3, 5, Hodgson must rely on

18  this court's supplemental jurisdiction to pursue these claims.  A federal court may decline to

19  exercise supplemental jurisdiction if it "has dismissed all claims over which it has original

20  jurisdiction."  28 U.S.C. § 1367(c)(3).  This decision "lies within the district court's discretion."

21  *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (citation omitted).  "[I]n

22  the usual case in which all federal-law claims are eliminated before trial, the balance of factors to

23  be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness,

24  and comity—will point toward declining to exercise jurisdiction over the remaining state-law

25  claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 364 n.7 (1988).  This case fits that mold.

26  Aside from litigation over the defendants' motions to dismiss, very little has occurred in this court

27  to date.  The state law claims are dismissed without leave to amend as well.  The court does not

28  /////

14

reach the defendants' argument that they are entitled to an affirmative defense based on fraudulent inducement.

## II.     MOTION FOR SANCTIONS

### A.     Background

In addition to dismissal, the defendants seek sanctions against Hodgson, his attorney Thomas Barth, and Barth's firm.  *See* Mot. Sanctions, ECF No. 29; Mem. Sanctions, ECF No. 29-1.  Defendants tell a very different story about Hodgson's history with Vacaya.  Their version also begins while Hodgson was incarcerated, when they say he began making false claims about his criminal convictions in the hope that he could work for Vacaya.

In December 2015, while Hodgson was incarcerated, he told Roper he had "finally" received "official notice from the court" that he did not "owe any restitution for the money that was taken from the state contract."  Suppl. Roper Decl. ¶ 3 & Ex. 1-A at 1, ECF No. 29-3.  According to Hodgson's letter, "both the state & the courts" had "agreed & acknowledged that [he] personally did not steal any funds" or "personally profit from them."  *Id.* Ex. 1-A at 1 (verbatim transcription).  He mentioned a "legal document" that said he was "not a thief."  *Id.* Hodgson elaborated on this claim at least twice more.  In March 2016, he described the same document as a "judge's order" saying he was "not responsible for the state's losses" and would not "have to pay restitution" after he was released.  *Id.* ¶ 4 & Ex. 1-B at 2.  And in April 2016, he described the order as "a little piece of paper from the judge" saying he was "not responsible" because he "didn't steal any money or profit from it."  *Id.* ¶ 5 & Ex. 1-C at 2.

After Hodgson was released and soon after Vacaya was founded, Hodgson applied for a job.  *See* Roper Decl. ¶ 7 & Ex. 1-A, ECF No. 23-2.  He promised to send Roper a copy of the "letter," referring to the court document Hodgson had written about.  *See id.* ¶ 7.  When Hodgson did not send the "letter," Roper asked for it again the next month.  *Id.* ¶¶ 10–11 & Ex. 1-B.  Again, Hodgson did not send the "court letter," but he promised to "forward a copy" soon.  *Id.* ¶¶ 12–13 & Ex. 1-C.  Roper asked Hodgson yet again a few days later in a text message.  *See* Suppl. Roper Decl. ¶ 6 & Ex. 1-D, ECF No. 29-3.  Roper also asked for a "bit of info" about the conviction and "a few lines of story" he could give the insurance company "in regard to

1  [Hodgson's] employment." *Id.* Ex. 1-D at 1.  Hodgson described the conviction and explained his

2  decision to enter a plea agreement. *See id.* at 1–2.  He asked Roper if it would "be a problem."

3  *Id.*  "I honestly have no idea," Roper wrote, "I can't imagine (with the court letter) that it'll be a

4  problem." *Id.* (capitalization and punctuation formalized).

5        Hodgson eventually sent two documents he described as "letters from the court."  Roper

6  Decl. ¶¶ 14–19 & Ex. 1-D.  Both look very much like scanned copies of filings in the Sacramento

7  County Superior Court. *See id.* Exs. 1-E, 1-F.  The first includes an "order" bearing the apparent

8  signature of a California Superior Court Judge. *See id.* at 2–3.  The "order" permits Hodgson to

9  "withdraw his plea of guilty," dismisses "the accusations or information" against him, releases

10  him "from all penalties and disabilities resulting from the offense," and sets aside Hodgson's

11  restitution obligations. *See id.*  The second document also includes an "order" and the apparent

12  signature of a California Superior Court Judge. *See id.* Ex. 1-F at 5–7.  It reverses and sets aside

13  Hodgson's restitution award and "orders the return of funds gained through the sale" of property

14  the Attorney General had previously seized, in total more than $1.1 million. *See id.* at 6–7.

15        After reading these documents, Roper, Gunn, and Finen were satisfied the criminal

16  judgment against Hodgson had been vacated, or as Hodgson had put it in his letters to Roper, that

17  he was not a thief and owed nothing. *Id.* ¶ 20; Gunn Decl. ¶ 14, ECF No. 23-3; Finen Decl. ¶ 14,

18  ECF No. 23-4.  A few months later, Terrill received the two letters as well. *See* Terrill Decl.

19  ¶¶ 8–9.  The four founders then agreed to engage Hodgson as an independent contractor. *See,*

20  *e.g.*, Roper Decl. ¶¶ 23–24 & Ex. 1-H; Second Am. Compl. ¶ 30.  A year later, they also voted to

21  make Hodgson a member of Vacaya, believing still that the judgments against him had been

22  vacated. *See, e.g.*, Roper Decl. ¶ 27; Second Am. Compl. ¶ 53.

23        As summarized above, Hodgson's relationship with Vacaya soon ended in the wake of

24  allegations he had misused the company's resources and harassed a colleague.  While Vacaya was

25  investigating the harassment allegations, the company's attorneys learned Hodgson had been

26  accusing Roper, Gunn and Finen of fraud, theft, corporate espionage and other crimes. *See* Roper

27  Decl. ¶ 36 & Ex. 1-K.  Hodgson had also expressed an interest in publicizing these accusations

1    more broadly.  *See id.*; *see also*, *e.g.*, Suppl. Roper Decl. Ex. 1-E at 8;[3] Mem. Sanctions at 12–13.

2    Vacaya's attorneys sent a letter to Hodgson's attorney, the same attorney who represents him

3    now, Thomas Barth.  Roper Decl. Ex. K.  They demanded that Hodgson stop.  *Id.*  He did not

4    stop.  Instead, represented by Barth, Hodgson launched this litigation.

5          Hodgson's original complaint repeated many of the same claims of wrongdoing that he

6    had hoped to publicize, and it included several allegations that had little value beyond their

7    capacity to embarrass Vacaya's founders.  *See, e.g.*, Compl. ¶¶ 33, 35 (making allegations about

8    confidential discussions during mediation with Atlantis and about Finen's mental health).  Soon

9    after this lawsuit was filed, several other players in the travel industry received copies of

10   Hodgson's original complaint in envelopes bearing the logo of Roper's former employer,

11   Atlantis—the same company that had pursued trade secret claims against Roper and Gunn.  *See*

12   Suppl. Roper Decl. ¶ 8 & Exs. 1-F & 1-G.  Atlantis denied sending the letters.  *See id.* ¶ 8; Barth

13   Decl. ¶ 4(d)(2), ECF No. 24-2.  Vacaya's counsel believed that Hodgson might have sent them in

14   an attempt to discredit the company's founders.  *See* Mem. Sanctions at 13.  Hodgson owned a

15   printing and graphic design business, and the business has advertised its ability to print envelopes.

16   *See id.*; Suppl. Roper Decl. ¶ 13 & Ex. 1-J; Second Am. Compl. ¶ 32.  Barth denied that Hodgson

17   mailed copies of the complaint.  Barth Decl. ¶ 4(d)(3).  Hodgson himself has not said whether he

18   did.

19         Soon, Vacaya's founders and their attorneys also began to suspect that Hodgson had

20   forged the two court "letters" he had sent to them in 2017.  *See, e.g.*, Roper Decl. ¶ 25.  An

21   investigation confirmed their suspicions.  *Id.*  Defense counsel Todd Brooks confronted Barth

22   with this discovery during a phone call they had scheduled to meet and confer about the

23   defendants' current motion to dismiss.  Brooks Decl. ¶¶ 3–4, ECF No. 23-6.  Barth had no

24   response at the time.  *See id.*; Barth Decl. ¶¶ 2–4, ECF No. 24-2.  But a week later, Barth

25   conceded the two documents were forgeries.  Brooks Decl. ¶ 6(a); Barth Decl. ¶ 4(a).  He also

_____

[3] The motion to file this exhibit under seal is **granted**.  *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) (recognizing court's supervisory power to "insure that its records are not used to gratify private spite or promote public scandal" (citation and quotation marks omitted)).

admitted Hodgson had helped to create them.  Brooks Decl. ¶ 6(a)–(b); Barth Decl. ¶ 4(b).  But he accused Roper of participating in the forgery.  *See* Barth Decl. ¶ 4(b).  According to Barth, Roper and Hodgson had created the two orders side-by-side at Roper's table over the Thanksgiving holiday in 2017.  *Id.*  Barth also accused Roper of secretly circulating copies of Hodgson's complaint in the hope that Hodgson would take the blame.  *See id.* ¶ 4(d)(iv).  Barth does not say what evidence supported that claim; he offers only speculation based on suspicions about other alleged wrongdoing by Roper.  *See id.*

The defendants then filed their current motion to dismiss.  They argued among other things that Hodgson's claims were barred because he had lied to them about his criminal history.  *See* Mem. Dismiss at 10–12.  Vacaya's founders each submitted declarations averring they would never have agreed to work with Hodgson if they had known he had fabricated the two court orders.  *See* Roper Decl. ¶¶ 26, 28; Gunn Decl. ¶¶ 19, 21; Finen Decl. ¶¶ 19, 21; Terrill Decl. ¶¶ 12, 14.  They do not claim they would have acted differently if they had never heard of the "letters" at all.

As noted above, Hodgson opposed the motion to dismiss.  As Barth said before, Hodgson claimed again the forgeries had been Roper's idea, not his.  *See* Opp'n Dismiss at 16; Hodgson Decl. ¶¶ 10–20, ECF No. 24-3.  These claims are dubious to say the least.  By November 2017, when Hodgson claims Roper proposed forging a court order, Hodgson had already been planting seeds about court documents exonerating him for more than a year.  *See* Suppl. Roper Decl. ¶¶ 3–5 & Exs. 1-A, 1-B, 1-C.  He had also been promising to send those documents to Roper for at least a month.  *See* Roper Decl. ¶¶ 7–8 & Ex. 1-A.  Hodgson's joint-forgery theory also contradicts the fundamental premise of his complaint.  In his complaint, he alleges Roper and Vacaya's other founders did not intend to make him a member of the company.  *See, e.g.*, Second Am. Compl. ¶ 17 ("Roper, Finen, and Gunn were solely focused on making assurances to plaintiff about the value of his investments being awarded in the form of equity in the company, to induce investments by plaintiff, while they knew that they would never ultimately follow through on those statements and would never approve any substantial ownership stake for plaintiff in the company.").  But in his declaration, Hodgson claims Roper urged him to forge the

1   two court orders in an effort to ensure he would become a member of the new company despite

2   any objections from the other members.  *See* Hodgson Decl. ¶¶ 10, 11, 16.

3        The defendants request sanctions against Hodgson, Barth and his firm.  *See* Mot.

4   Sanctions, ECF No. 29; Mem. Sanctions, ECF No. 29-1.  Hodgson and Barth oppose the motion

5   and seek sanctions of their own.  *See generally* Opp'n, ECF No. 32.  Briefing is complete, and the

6   court submitted the motion without a hearing.  Reply, ECF No. 33; Min. Order, ECF No. 35.

7        **B.     Legal Standards**

8        The defendants cite three sources of legal authority in their request for sanctions.  First,

9   they rely on Federal Rule of Civil Procedure 11.  Under Rule 11, when attorneys sign and file any

10  "pleading, written motion, or other paper," they are certifying that "to the best of [their]

11  knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,"

12       (1)    the filing "is not being presented for any improper purpose, such as to harass,

13              cause unnecessary delay, or needlessly increase the cost of litigation,"

14       (2)    any "claims, defenses, and other legal contentions are warranted by existing law or

15              by a nonfrivolous argument for extending, modifying, or reversing existing law or

16              for establishing new law,"

17       (3)    any "factual contentions have evidentiary support or, if specifically so identified,

18              will likely have evidentiary support after a reasonable opportunity for further

19              investigation or discovery," and

20       (4)    any "denials of factual contentions are warranted on the evidence or, if specifically

21              so identified, are reasonably based on belief or a lack of information."

22  Fed. R. Civ. P. 11(b).

23       A court can impose sanctions for violations of Rule 11(b) in response to a party's motion

24  or on its own initiative.  *See* Fed. R. Civ. P. 11(c).  Before the court actually imposes any

25  sanctions, it must provide the party "notice and a reasonable opportunity to respond."  Fed. R.

26  Civ. P. 11(c)(1).  If a party moves for sanctions, it must file that motion "separately from any

27  other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R.

28  Civ. P. 11(c)(2).  "The motion . . . must not be filed or be presented to the court if the challenged

paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *Id.* If a court imposes sanctions on its own initiative, it must first order the party to show cause why specific conduct did not violate Rule 11(b). Fed. R. Civ. P. 11(c)(3), (5). If the court determines that Rule 11(b) has been violated, it may impose "an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." *Id.* "An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6).

Sanctions under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* The court may also "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2).

Second, in addition to Rule 11, the defendants rely on 28 U.S.C. § 1927. Under that statute, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Sanctions pursuant to section 1927 must be supported by a finding of subjective bad faith." *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989). An attorney exhibits bad faith by "knowingly or recklessly rais[ing] a frivolous argument or argu[ing] a meritorious claim for the purpose of harassing an opponent." *Id.* (quoting *Est. of Blas Through Chargualaf v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)). Section 1927 "may shift the entire financial burden of an action's defense, including attorneys' fees, if the entire course of proceedings was unwarranted and should not have been commenced or pursued." *Blixseth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626, 632 (9th Cir. 2017). This includes "an award of attorneys' fees incurred in

20

1    obtaining a sanctions award." *Id.* But there must be a "causal connection" between the

2    misbehavior and the fees awarded. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178,

3    1186 n.5 (2017).

4          Finally, the defendants rely on this court's "inherent power . . . to levy sanctions in

5    response to abusive litigation practices." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980).

6    This "inherent power extends to a full range of litigation abuses," *Chambers v. NASCO, Inc.*,

7    501 U.S. 32, 46 (1991), including the authority to "assess attorneys' fees . . . when the losing

8    party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," *Rodway Exp.*,

9    447 U.S. at 766 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59

10    (1975)). "Bad faith may be found, not only in the actions that led to the lawsuit, but also in the

11    conduct of the litigation." *Id.* (alterations omitted) (quoting *Hall v. Cole*, 412 U.S. 1, 15 (1973)).

12    A sanctions order must be "limited to the fees the innocent party incurred solely because of the

13    misconduct—or put another way, to the fees that party would not have incurred but for the bad

14    faith." *Goodyear*, 137 S. Ct. at 1184.

15          **C.    Discussion**

16          The court finds at the outset that the defendants have satisfied the 21-day "safe harbor"

17    requirement for a Rule 11 sanctions motion. *See* Fed. R. Civ. P. 11(c)(2). Although the draft

18    motion the defendants served on Hodgson and his counsel was not identical to the motion they

19    eventually filed, it included the same arguments, and any difference caused no prejudice to

20    Hodgson or his counsel. Some district courts have required filed copies of a sanctions motion to

21    be identical to the served copies, but the Ninth Circuit has never imposed this requirement, and it

22    has affirmed a district court's decision to award sanctions under Rule 11 even though the filed

23    copy differed from the served copy. *Edgerly v. City & Cty. of San Francisco*, No. 03-02169,

24    2005 WL 235710, at *3 (N.D. Cal. Feb. 1, 2005), *aff'd*, 599 F.3d 946, 963 (9th Cir. 2010); *see*

25    *also Rygg v. Hulbert*, No. 11-1827, 2012 WL 12847008, at *3 (W.D. Wash. Sept. 21, 2012)

26    (reasoning similarly and citing *Edgerly* but declining to award sanctions), *aff'd*, 611 F. App'x 900

27    (9th Cir. 2015) (unpublished) ("[T]he district court would have been justified in granting [the]

28    motion for Rule 11 sanctions . . . .").

On the merits, the court declines to sanction Barth for maintaining this lawsuit after learning the two court orders had been forged.  It was not frivolous to argue, as Barth did on Hodgson's behalf, that the defendants were not entitled to judgment despite the forgery. Fraudulent inducement is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and a defendant normally bears the burden to plead and prove its affirmative defenses, *see, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).  In most cases, the elements of a claim for fraudulent inducement include justifiable reliance and damages.  *See, e.g.*, *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996).  For these reasons, it was not frivolous to argue discovery was necessary to investigate whether the defendants could prove reliance and damages.  *See* Opp'n Dismiss at 14–16.  It is unclear, for example, what Vacaya's founders would have done differently if they had never received the two forged court orders.  They did not claim in their declarations they would never have worked with Hodgson if he had never claimed falsely that his conviction and restitution obligations had been vacated.  For these reasons, an attorney in Barth's position could reasonably have pursued this case further in an effort to investigate whether the claims in the defendants' declarations were credible.

The court also declines to award sanctions against Barth and Hodgson based on the defense theory that Hodgson's purpose in filing this action was to harass and embarrass Vacaya's cofounders.  The timing of the filing raises a question, to be sure.  Barth filed the original complaint on Hodgson's behalf soon after Hodgson expressed a desire to publicize the defendants' alleged wrongdoing.  The original complaint included several superfluous embarrassing allegations, and someone anonymously mailed copies of the original complaint to third parties in the travel industry.  That said, most if not all litigation can be harassing and embarrassing to some extent.  The court cannot conclude on this record that Hodgson advanced his claims for improper purposes.

The court does find, however, that Barth's and Hodgson's actions were abusive and in bad faith under both Rule 11 and § 1927 and thus worthy of sanctions under those Rule 11, § 1927, and this court's inherent authority.  Their conduct is sanctionable in four respects.

/////

First, it is undisputed that Hodgson helped forge the two court orders, even if he was not solely responsible for them.  He admits he sent these orders to the defendants in the hope they would employ him and make him a member of Vacaya.  He also withheld information about the forgeries for several years.  By all accounts, Hodgson said nothing about the forgeries until the defendants discovered them and confronted Hodgson's attorney.  Three complaints had been filed on Hodgson's behalf by that time.  Even if Roper also participated in the forgery scheme, as Hodgson now alleges, Hodgson's own actions were deceptive and abusive.  By Hodgson's own telling, he helped deceive three of the four individual defendants.  He sued them to enforce agreements that he procured in part by fraud.

Second, Barth had an obligation to conduct an investigation before filing any document in this action on Hodgson's behalf, but he did not.  Under Rule 11, an attorney must conduct an investigation that is "reasonable under the circumstances" to ensure the claims in a client's filing have "evidentiary support" and are "not being presented for any improper purpose."  *See* Fed. R. Civ. P. 11(b).  In Hodgson's complaint, he alleges Roper and Vacaya's cofounders did not intend for Hodgson to become a member of the company.  Barth, however, filed Hodgson's declaration, in which he claims Roper defrauded the other three cofounders in an effort to ensure Hodgson would become a member of the company.  Barth does not explain how he reconciled that stark inconsistency before filing Hodgson's declaration.  Although Barth cites a few ancillary consistencies between Hodgson's declaration and his complaint, *see* Suppl. Barth Decl. ¶ 6(c), ECF No. 32-1, he offers nothing that might explain the fundamental contradiction between Hodgson's complaint and his declaration.  Barth violated Rule 11 by filing the declaration without considering, confronting and resolving that contradiction.

Third, relatedly, Hodgson claims in his declaration that Roper was the one who proposed forging court orders in November 2017, but Hodgson had been making claims about the same fictitious documents since 2015.  The court cannot conclude that Barth investigated these assertions before filing them on Hodgson's behalf.  Barth claims to have reviewed documents from Hodgson's criminal case, and he claims these documents reassured him that Hodgson was simply mistaken in his earlier statements, but he does not say which documents he reviewed or

why those documents led him to believe that Roper and not Hodgson conceived of the fraud.  *See* Suppl. Barth Decl. ¶ 6(d).  On this point, Barth also relies on a supplemental declaration Hodgson submitted in opposition to the defendants' motion for sanctions.  *See id.*; *see also* Suppl. Hodgson Decl. ¶¶ 2–5, ECF No. 32-2.  This supplemental declaration raises more questions than it answers.  Hodgson claims in that supplemental declaration, for example, that he had simply misunderstood "information from [his] parents about actions being taken by the state regarding restitution," and he claims he simply believed that "the state was not taking any further action to enforce restitution."  Suppl. Hodgson Decl. ¶ 3.  But Hodgson wrote unambiguously in 2015 and 2016—years before Roper supposedly proposed the forgery—that he had a "letter," an "official notice from the court," "judge's order," "legal document" or a "little paper from the judge," not "information."  Suppl. Roper Decl. ¶¶ 3–5 & Exs. 1-A, 1-B, 1-C.  Again, the court cannot conclude that Barth conducted the necessary investigation before filing Hodgson's supplemental declaration; instead Barth appears to have filed it without caring whether it was false.

Fourth, Barth has advanced the unlikely theory, on Hodgson's behalf, that Roper secretly publicized embarrassing allegations about himself by circulating copies of Hodgson's complaint in the hope that Hodgson would take the blame.  *See* Barth Decl. ¶ 4(d); Opp'n Sanctions at 17. Barth has no evidence to support these claims.  He instead speculates that Hodgson could not have found a publicly available filed copy of the complaint, and accuses Roper of keeping a secret "cache" of envelopes like those used to mail the copies of Hodgson's complaint.  Barth Decl. ¶ 4(d)(3); Opp'n Sanctions at 17.  By repeating these accusations, Barth complicated the litigation unnecessarily in violation of § 1927 and violated his obligations under Rule 11.

In conclusion, Hodgson's actions were abusive and deceptive and deserving of sanctions under this court's inherent authority.  Barth's actions were either the result of his failure to conduct a reasonable inquiry, and thus a violation of Rule 11(b)(3), or were a purposeful effort to cast aspersions on Roper and prolong the litigation in bad faith, and thus a violation of Rule 11(b)(1) and § 1927; in both instances, Barth's conduct was abusive and deserving of sanctions under this court's inherent authority.  Barth's and Hodgson's actions also caused unnecessary delays and increased the costs of this litigation for all involved, including the defendants, their

counsel, this court and its staff.  The court thus concludes (1) sanctions against Hodgson are appropriate under this court's inherent authority to prevent and remedy the harms of abusive and wasteful litigation, and (2) sanctions against Barth and his firm are appropriate under Rule 11, 28 U.S.C. § 1927 and this court's inherent authority.

## III.   CONCLUSION

The motion to dismiss (ECF No. 23) is **granted without leave to amend**.  The request to seal (ECF No. 30) is **granted**.  The defendants' motion for sanctions (ECF No. 29) is **granted** with the amount of sanctions to be determined as described below.  The request to file under seal (ECF No. 30) is **granted**.

**Within thirty days**, the defendants may submit a request for the attorneys' fees and costs they incurred as a direct result of the sanctionable conduct described above, along with evidence to support that request.  This request may include a request for fees and costs incurred seeking sanctions.  Hodgson and his counsel may file objections to any such request **within fourteen days**, and the defendants may respond to these objections **within seven days**, after which the matter will be submitted.

This order resolves ECF Nos. 23, 29, and 30.

IT IS SO ORDERED.

DATED:  January 31, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE